**ALASKA CHILDREN'S SERVICES, INC., Appellant,**

v.

**Francis S. L. WILLIAMSON, Commissioner, Department of Health and Social Services, and State of Alaska, Appellee.**

**No. 4155.**

Supreme Court of Alaska.

Feb. 21, 1980.

Charles K. Cranston, Gallagher, Cranston, Snow, Walters & Dahl, Anchorage, for appellant.

Thomas H. Robertson, Asst. Atty. Gen., Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER, BURKE and MATTHEWS, JJ.

## OPINION

CONNOR, Justice.

This case presents issues of statutory interpretation.

Appellant Alaska Children's Services, Inc. (hereinafter ACS) is a private, non-profit corporation[1] that owns or operates residential child care facilities in Anchorage and Unalaska. Since 1971, ACS has provided full-time child care services for children who have become wards of the state by "agreement" with the Department of Health and Social Services (hereinafter DHSS). There has been no written contract between these parties. Rather, a working relationship developed that purported to follow statutory and administrative guidelines for state placement and support of these children.

The controversy that has arisen concerns the amount the state must pay ACS for its child care services. The focus is upon two related statutes. The first, AS 47.40.-010(a)(3),[2] states that when the DHSS purchases services for persons for whom the state has assumed responsibility, it shall "pay all expenses related directly to the full cost of services at the levels of care required." The second statute, AS 47.40.-040(a),[3] provides that the " 'full cost' of services shall be determined by the per person, per day cost[4] in the preceding fiscal year plus a proportionate share of anticipated cost of living and staff salary increment increases" for the upcoming fiscal year.

DHSS has been paying ACS in accordance with this second statute; that is, pay-

---

1. ACS's letterhead indicates that it was founded jointly by the American Baptist, American Lutheran, and the United Methodist Churches.

2. The full text of AS 47.40.010 provides:
   *Purchase of Services.* (a) When the department [DHSS] purchases services for persons for whom the state has assumed responsibility under the laws of the state, the department shall
   (1) adopt regulations establishing the levels of care to be provided;
   (2) determine the rates of payment for the full cost of services required;
   (3) pay all expenses related directly to the full cost of services at the levels of care required;
   (4) make the placement of persons in accordance with the levels of care provided for in the regulations.
   (b) Services of jails and other penal institutions may not be included in services purchased by the state in this chapter.

3. AS 47.40.040 reads in full:
   *Determination of full cost of services.* (a) In this chapter, "full cost" of services shall be determined by the per person, per day cost in

the preceding fiscal year plus a proportionate share of anticipated cost of living and staff salary increment increases for the fiscal year for which the full cost of services, determined to be necessary by the department, is being determined. Child care costs for foster homes shall be computed in the same manner as for child care and nursing home institutions except that no salary costs may be considered.
   (b) Full cost of services does not include the following:
   (1) expenses, including salaries and fees, incurred in raising funds;
   (2) funds expended for construction, major equipment and other capital expenditures;
   (3) depreciation and replacement costs of, and costs of additions to, major property and equipment;
   (4) religious training and education; and
   (5) services provided which are substandard to, or exceed, the requirements of the department.

4. The per person, per day cost in each institution is referred to as the "unit cost."

ment has been determined by calculating the "unit cost"[5] in the past year for each institution and adding to this a percentage based upon the rise in costs predicted at the beginning of each fiscal year. ACS claims this has been insufficient because *actual* cost increases have generally been much greater[6] than the *predicted* increases, and that therefore the DHSS has not in fact paid "*all* expenses related directly to the full cost of services" as required by AS 47.40.010(a)(3). As a result, according to ACS, it lost over $200,000 in variable costs[7] by providing child care services for the state. between 1971 and 1976. This case arose from ACS's attempts to secure reimbursement from the state for these extra expenses and for an additional $350,000. The latter figure represents alleged depreciation of its facilities and equipment stemming from the care of state-placed children between 1971 and 1976 and variable costs for child care provided after 1976.

No findings of fact have yet been made as to the correctness of ACS's cost figures or accounting methods, since that issue was preempted by the decision below. It is clear, however, that ACS is not seeking payment for any extravagances or other expenses that were not necessary to maintain those standards of care which have been established by statute or DHSS regulations.

The record reflects that for a number of years prior to 1976 ACS had informally attempted to get full reimbursement from the DHSS on the basis of its actual costs as established by year-end audits. Some lobbying efforts were undertaken in the legislature, and the executive director of ACS, John Garvin, wrote numerous letters to DHSS officials explaining its position. These efforts proved unsuccessful and, as a result, on October 19, 1976, ACS filed suit against the Commissioner of DHSS, Francis

Williamson, seeking reimbursement for all of its actual, permissible expenses allegedly incurred in providing child care for the state from 1971 to 1976. The suit was subsequently held in abeyance by stipulation and order dated January 10, 1977, to allow ACS to pursue its administrative remedies.

ACS then formally applied to Commissioner Williamson for relief, claiming that AS 47.40.010 required DHSS to reimburse it for *all* expenses actually incurred in providing child care services for the state at acceptable standards. ACS contended that year-end audits done by both state and private agencies demonstrated that it had not been paid for all such expenses, and that therefore "cost-settling" was required between the state and the provider.

Commissioner Williamson rejected these arguments, holding that ACS was entitled only to payments calculated on the basis of AS 47.40.040(a). Since that statute specifically provided for the method of calculating the "full cost" of services, the DHSS was bound to authorize payments only for those amounts predicted at the beginning of each fiscal year.

ACS appealed the Commissioner's decision to the Department of Administration, and a hearing was held on June 23, 1977. ACS presented its facts and figures, and urged that the two statutes, when read together, required cost-settling. On July 20, 1977, the Department of Administration ruled against ACS, holding that the statutes had been properly construed by DHSS. The decision was subsequently appealed to the superior court and, following briefing and argument, it summarily affirmed the ruling below by order on June 14, 1978. The appeal to this court followed.

---

5. See fn. 4, *supra*.

6. In one year, 1974, ACS admits to have actually made a profit of about $6,800 on providing care for state-placed children. For other years, however, *its figures show it suffered rather* substantial losses.

7. "Variable costs" in this sense refers to those costs relating to daily maintenance, such as food, clothing, medical expenses, wages, etc. As will be noted *infra*, the actual "variability" of these costs is relatively limited by the prescribed standards of care which such child care institutions are required to provide.

The two statutes at issue here were enacted at the same time and deal with the same subject matter. They are *in pari materia* and should be construed so as to be consistent with one another and in such a manner as to give maximum effect to each. D. Sands, *Sutherland Statutory Construction*, § 51.03 (4th ed. 1973).

Although ACS does not claim that these statutes, on their face, give rise to any ambiguity, its argument implies that a type of functional ambiguity arises whenever predicted cost increases do not equal actual cost increases. When this occurs, according to ACS, the method for determining payment under AS 47.40.040(a) does not satisfy the requirement of AS 47.40.010(a)(3), which requires the DHSS to "pay *all* expenses related directly to the full cost of services at the levels of care required." [emphasis added] In support of this argument, ACS contends that the legislature recognized the need to furnish providers with operating capital during the year, rather than paying them a lump sum at the end of the year. As a result, ACS claims the legislature enacted AS 47.40.040(a) as a means for providing current payments that follow a formula intended to reimburse providers for their full costs, as required by AS 47.40.010(a)(3). While those payments may satisfy the requirements of AS 47.40.010(a)(3) in years when the cost increases are correctly predicted, in years where actual cost increases exceed the predicted increases the promise of the statute is unfulfilled. Therefore, according to ACS, cost-settling must be done at the end of each fiscal year in order to give full effect to both statutes.

The state responds that the wording of the statutes is clear and, regardless of the actual operational effect of AS 47.40.040(a), ACS is entitled to payment only for expenses which have been estimated pursuant to the statute.

AS 47.40.010(a)(3) states that "all" the expenses to be paid must relate to the "full cost" of services. AS 47.40.040(a) sets forth how the "full costs" of services are to be determined by the DHSS. There is nothing provisional about the manner in which "full cost" of services must be determined under the statute. The statute evinces a legislative intention to place in the hands of administrative officials the task of predicting cost increases each year. Whether they do this well or poorly, there is nothing in the statutory language which permits cost-settling at the end of each year.[8] While we think it unfortunate that ACS, which must observe high standards of child care, must lose money in some years when the costs exceed the predicted amounts, we can find no basis for reading the statute in the manner urged by ACS. The remedy lies with the legislative branch of government, not the courts. We hold that the superior court correctly construed the statute. Accordingly, there was no error.

ACS asserts that the statute, as here construed, deprives ACS of due process and denies to it the equal protection of the laws. We are unpersuaded. First, the analogy to the regulation of public utility rates is incomplete, for there are many aspects of ACS's activities which do not compare with that of a public utility. Most prominently, ACS is free to decline to provide child care services for the state. Second, as to equal protection, ACS has not convinced us that the different statutory treatment given to providers of medical services does not bear a fair and substantial relationship to a legitimate government objective.[9] *See State v. Erickson*, 574 P.2d 1, 12 (Alaska 1978).

AFFIRMED.

---

8. By contrast, cost-settling is expressly permitted as to providers of medical care. AS 47.07.070. This undercuts the ACS argument that the legislature intended retroactive cost settling under AS 47.40.010 and AS 47.40.040.

9. There are several rational reasons for treating institutions providing child care differently from those providing medical care:

(1) The need for medical care is more immediate than the need for child care. Cost settlement is, therefore, justified as a means of attracting medical providers and insuring that needy Alaskans will have immediate access to necessary medical care.

(2) While foster care or out-of-state placement provides an adequate alternative to institutional providers of child care, there is no adequate alternative to medical providers. (3) Unlike institutional child care services, the complexity of medical services does not lend itself to prospective rate setting at a state level.

(4) Federal regulations mandate that states participating in a medicaid program pay the reasonable costs of certain medical providers. No similar compulsion exists with respect to institutional child care.